UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TIFFANY HOSTER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) 04 C 6141 |
| | ) |
| HEWITT ASSOCIATES LLC, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

CHARLES P. KOCORAS, Chief District Judge:

This matter comes before the court on Defendant, Hewitt Associates LLC's ("Hewitt"), motion for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons set forth below, the motion is granted.

## BACKGROUND

We only consider those relevant facts that are presented in conformity with Local Rule 56.1 ("L.R. 56.1"). The alleged facts not properly before us or unsupported by the record have been disregarded. See Brasic v. Heinemann's Inc., 121 F.3d 281, 284 (7th Cir.1997) (refusing to consider the plaintiff's additional facts where not supported by specific references to the record). Plaintiff Tiffany Hoster ("Hoster") has failed to file an answer to Defendant's motion or submit a L.R. 56.1 fact statement and

therefore only those relevant facts, taken from Hewitt's L.R. 56.1 statement and supported by the record, have been considered.  Garrison v. Burke, 165 F.3d 565, 567 (7th Cir.1999).

Hewitt is a consulting firm in the business of developing and administering benefit, retirement, and other human resources related plans for corporate clients. Hoster, an African American female, was employed by Hewitt from February 1998 until her employment was terminated on October 11, 2002.  While so employed, Hoster worked in the Support Center of Hewitt's Information Systems Department ("ISD"). She primarily answered calls from, and provided computer related support to, Hewitt employees.  She generally received between 15 and 30 calls per shift.  Hoster's direct supervisor, and Support Center Manager, was Leon Lewis ("Lewis").  Todd Klopfenstein ("Klopfenstein") managed the entire ISD.  Colleen Hichborn ("Hichborn") was, at all relevant times, the Human Resource Generalist responsible for the Support Center.

Hoster was familiar with Hewitt's policies governing employee time off. Pursuant to those policies, associates who have worked from one to five years for the organization receive 16 days of Personal Time Off ("PTO") per year to take for any reason and may purchase up to five additional days of PTO at the beginning of the year. Those associates also receive approximately 10 days of medical leave per year.

-2-

Qualifying associates under Hewitt's Salary Continuation Policy ("SCP") may take up to six-months of paid sick/short term disability leave. Further, when warranted, associates are entitled to concurrent unpaid leave under state and federal leave laws, such as the Family and Medical Leave Act ("FMLA"). Hewitt also has policies in place prohibiting harassment, discrimination and retaliation.

Generally, when associates request additional medical leave, Hewitt's Benefits Administration Unit ("BAU") requests that the associate, or if necessary, her physician, adequately complete and submit a Disability/Salary Continuation form ("medical form") providing medical information which is utilized by the BAU to determine the associate's eligibility under the FMLA or Hewitt's SCP. Once presented with such a request, the associate is given fifteen days to complete and submit the medical form. In the event that the medical information provided by the associate is unclear, or additional information is necessary, the BAU enlists the services of Medical Management Associated, Inc. ("MMA"), a medical case management support company not controlled by Hewitt, to aid in clarification and to make recommendations regarding the medical situation in question. In evaluating a situation, MMA looks at whether a physician has provided information, whether an associate is being treated by a physician, the intensity and frequency of treatment, how often the associate sees the physician, the severity of symptoms which make the patient unable to perform the

functions of the job, compliance with treatment or care, and kinds of, or changes in, medications the patient is taking.

Hoster took eleven weeks of leave for the birth of her child, administered pursuant to the FMLA, from December 21, 2001 through March 8, 2002. On August 2, 2002, approximately 5 months after her return to work, Hoster notified Hewitt that she was taking additional time off. At that time, Hoster had exhausted all of her PTO, had taken 29 additional hours of PTO which she had not paid for, and had approximately one week of unpaid FMLA leave available. That was the last date that Hoster reported to work at Hewitt.

On August 2, 2002, Mary Hendrix, from the BAU, informed Hoster in a letter that her doctor needed to fill out and submit a medical form, and that failure to do so within 15 days would result in an unauthorized classification of her absence. A medical form and FMLA information were also included. Hoster responded by faxing the medical form back to Hewitt, but it was only partially completed. The form was not sufficiently legible and failed to indicate a course of treatment or otherwise provide support for her absence. Hoster was then told on numerous occasions that additional medical information was required to evaluate her absence and to complete and resubmit another medical form. Tami Strom ("Strom") and Hichborn, both on Hewitt's behalf, informed Hoster via telephone conversations and written correspondence, that the

-4-

information she provided was insufficient and that additional information was required to determine her leave eligibility. Further, she was warned that disciplinary action was imminent if she failed to provide such information.

On August 22, 2002, Hewitt enlisted the services of Arlyce Everson ("Everson"), a certified nurse with MMA, to aid in clarifying the information provided by Hoster and for any recommendations as to their appropriate response. Everson spoke with both Hoster and her physician, Dr. Boddapati ("Boddapati"), regarding Hoster's absence and incomplete medical form. On numerous occasions Everson sought to clarify the situation by requesting medical information from Hoster and Boddapati. Their responses indicated that during her absence, Hoster had made appointments with Boddapati, as well as with another therapist, that she had missed the majority, if not all, of those scheduled appointments.

In early September 2002, because Hoster had not reported to work in over a month, Lewis contacted the Human Resource Department and requested that he be allowed to fill her position. On September 9, 2002, Hewitt sent Hoster a letter indicating that due to her prolonged absence the company was filling her vacant position, that an adequately completed medical form had not yet been received, and in the event that she provided such, it was possible she could resume working at Hewitt but that an ISD position may be unavailable.

On September 10, 2002, Hoster notified Hichborn that she had been medically released to return to work as of September 15, 2002. Hichborn responded by informing Hoster that she would be prohibited from returning to work until the requested medical form was completed and adequately provided, and that until then her absences were considered unauthorized.

On October 1, 2002, Hichborn sent Hoster another letter notifying her that if a completed form was not submitted within seven days, her employment would be terminated. On October 8, 2002, Hoster faxed Everson a letter from Boddapati dated October 4, 2002, indicating that Hoster had been a patient of Boddapati's since August 1, 2001; however, the faxed letter failed to indicate Boddapati's diagnosis of Hoster's condition, how many times Boddapati had met with Foster for a medical consultation, or how long Hoster had been taking any medication. The letter did make specific reference to the emotional problems of Hoster's son, but failed to discuss Hoster's need for medical leave.

On October 10, 2002, Everson, based upon the information at her disposal, concluded, and informed Strom, that Hoster's absence did not qualify as a disability under Hewitt's SCP. Strom relayed Everson's conclusion to Hichborn and indicated that the BAU concurred. Hichborn then, in connection with Hewitt associate relations

and legal counsel, decided to terminate Hoster's employment because of her prolonged leave of absence. Klopfenstein played no part in the termination decision.

Hewitt has terminated other employees for unauthorized leave of absences. Between October 2002 and October 2005, 128 employees had been terminated for such. Of those employees: one was American Indian/Alaskan Native; two were Asian/Pacific Islanders; nine were Hispanic; 34 were Black; 52 were white; and the remaining 30 chose not to disclose their race or it was unknown.

In 2001, approximately one year prior to her termination, Hoster filed a discrimination claim with Hewitt. Hoster never spoke with anyone in Hewitt's Human Resource Department regarding her claim, and neither Hichborn nor Strom had any knowledge of, or involvement in, that claim prior to her termination.

On September 21, 2004, Hoster filed a *pro se* complaint alleging Hewitt discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a). On April 21, 2005, Luis A. Oviedo filed an attorney appearance on behalf of Hoster. Hewitt now moves for summary judgment on all claims.

## LEGAL STANDARDS

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505 (1986). In seeking a grant of summary judgment the moving party must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986) (quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348 (1986); rather, "[a] genuine issue exists when the evidence is such that a reasonable jury could find for the non-movant." Buscaglia v. United States, 25 F.3d 530, 534 (7th Cir.1994). When reviewing the record we must draw all reasonable

inferences in favor of the non-movant; however, "we are not required to draw every conceivable inference from the record-only those inferences that are reasonable." Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir.1991). With these principles in mind we address Hewitt's motion.

## DISCUSSION

Hoster alleges that she was terminated in violation of Title VII and the ADA, on account of her sex, race and an alleged disability and, in addition, the victim of Hewitt's discriminatory retaliation. An employee can defeat a summary judgment motion utilizing either the direct method of proof or by utilizing the indirect burden-shifting approach defined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801-03 (1973). Krchnavy v. Limagrain Genetics Corp., 294 F.3d 871, 875 (7th Cir. 2002).

Attempting to show discrimination using the direct method "essentially requires [a showing of] an admission by the decision-maker that his actions were based upon the prohibited animus." Rogers, 320 F.3d at 753; Radue v. Kimberly-Clark Corp., 219 F.3d 612, 616 (7th Cir. 2000). The Seventh Circuit has held that a plaintiff can proceed under the direct method of proof with circumstantial evidence, Davis v. Con-Way Transp. Cent. Express, Inc., 368 F.3d 776, 783 (7th Cir. 2004); however, the circumstantial evidence "must point directly to a discriminatory reason for the employer's action." Adams v. Wal-Mart Stores, Inc., 324 F.3d 935, 939 (7th Cir.

2003). Hoster's complaint puts forth only two alleged derogatory comments made by Klopfenstein as direct evidence of discrimination. It is questionable whether these comments are even evidence which Hoster can rely upon in bringing her claim because she fails to indicate a reasonable time-frame as to when they were made. Even if this evidence is admissible, it is insufficient to show discrimination or retaliation under the direct method. Thus we address her claims under the indirect method.

Under the indirect method, Hoster has the initial burden of establishing a *prima facie* case. Krchnavy, 294 F.3d at 875. If she does so successfully, then the burden shifts to Hewitt to provide a "legitimate nondiscriminatory reason" for the adverse employment action. Id. at 876. If such a reason is supplied, Hoster must then show that Hewitt's reason is merely a pretext for unlawful discrimination. Id.

## A. Hoster's Unlawful Termination Claim

To establish a *prima facie* case of discrimination alleging unlawful termination, a plaintiff must show: (1) membership in a protected class; (2) that she was performing her job in a satisfactory manner; (3) that she was subjected to an adverse employment action; and (4) that similarly situated employees were treated more favorably. Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc., 254 F.3d 644, 650 (7th Cir. 2001). It is undisputed that Hoster is a member of a protected class and that she suffered an adverse employment action. Therefore, we are left to address whether she

was meeting Hewitt's legitimate expectations and whether similarly situated employees, not members of her protected class, were treated more favorably.

First, Hewitt contends that because of Hoster's prolonged unexplained absence she fails to meet her burden of proving that she met its legitimate expectations. The undisputed facts seem to indicate that Hoster began her prolonged absence from work due to an alleged medical condition, and that at that time she had utilized all of her PTO and the majority of her sick leave. Based on Hewitt's time off policies, it is evident that at the time of Hoster's termination, Hewitt's legitimate expectation was that associates would attend work. In addition, Hewitt expected that associates, after utilizing their automatic PTO and sick leave, would follow the proper procedures when requesting additional time off and submit the appropriate information to the BAU when asked. It is undisputed that Hoster knew of these policies yet failed to comply. Consequently, Hoster fails to meet her burden of proving that she was meeting Hewitt's legitimate expectations.

Similarly Hoster has failed to meet her burden of showing similarly situated employees, not in her protected class, who Hewitt treated more favorably. In determining whether a certain employee is similarly situated to other employees, the court should consider whether the employees possess analogous attributes, experience, education, and qualifications and are in materially parallel positions. Radue, 219 F.3d

at 617-18. A plaintiff need not show "complete identity" in comparing herself to a younger employee, only substantial similarity. Id. at 618. Hoster's complaint alleges, without any support for such, that two similarly situated employees, who also took prolonged periods of time off, were treated more favorably than she was. The undisputed facts show that Hewitt has no record of one of the alleged employees, and that the other was never fired, but instead left voluntarily to start her own business and was later rehired by Hewitt. The facts further show that Hewitt terminated many employees of varying ethnic backgrounds for the same type of insubordination that Hoster was accused of. Consequently Hoster fails to establish that Hewitt treated any similarly situated employees, not in her protected class, more favorably than she was.

Hoster's attempt to establish a *prima facie* case for unlawful discriminatory termination fails because she is unable to show that she was meeting Hewitt's legitimate expectations and that Hewitt treated similarly situated employees more favorably. Therefore, we find it unnecessary to address Hewitt's proffered reason for the termination or whether that reason is really pretext for discrimination. Consequently, summary judgment is appropriate on Hoster's unlawful termination claims.

## B. Hoster's Retaliation Claim

Hoster also asserts that Hewitt retaliated against her by terminating her employment for filing a discrimination claim with the company over a year before her termination. In order to establish a *prima facie* case of retaliation, a plaintiff must show that: "(1) she engaged in statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite meeting her employer's legitimate expectations, she suffered a materially adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." Hilt-Dyson v. City Of Chicago, 282 F.3d 456, 465 (7th Cir. 2002).

Once again, it is undisputed that Hoster suffered an adverse employment action, and that filing her discrimination complaint with Hewitt constitutes a protected activity. Hoster's complaint seems to suggest that she believes that the timing of the events alone gives rise to an inference of discriminatory retaliation; however, speculation based on suspicious timing alone does not support a reasonable inference of retaliation. Sauzek v. Exxon Coal USA, Inc., 202 F.3d 913, 918 (7th Cir. 2000). Regardless, as previously decided in our discussion of Hoster's unlawful termination claim, she woefully fails to establish that she was meeting Hewitt's legitimate expectation or that there were any similarly situated employees treated more favorably than she was.

Consequently, without showing such fundamental elements of a retaliation, summary judgment is warranted.

## **CONCLUSION**

For the reasons set forth above, Hewitt's motion for summary judgment is granted as to all counts.

/s/ Charles P. Kocoras
Charles P. Kocoras
Chief Judge
United States District Court

Dated:   November 23, 2005